IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED IN OPEN COURT

MAR - 7 2019

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:19-CR-70 |
| | ) | |
| v. | ) | Counts 1 – 11: 18 U.S.C. § 1343 |
| | ) | (Wire Fraud) |
| BRIAN THOMAS REYNOLDS, | ) | **UNDER SEAL** |
| | ) | |
| Defendant. | ) | Forfeiture Notice |

### INDICTMENT

March 2019 Term - at Alexandria, Virginia

### COUNTS 1 – 11

(Wire Fraud)

THE GRAND JURY CHARGES THAT:

#### Introductory Allegations

At all times material to this Indictment, unless otherwise specified below:

1. Defendant BRIAN THOMAS REYNOLDS resided in Leesburg, Virginia, within the Eastern District of Virginia.

2. Company A was a limited liability company formed in the Commonwealth of Virginia in or around 2016. Company A maintained its principal office in Sterling, Virginia, within the Eastern District of Virginia.

3. Company A operated Newspaper A, a newspaper that was based in the Commonwealth of Virginia. Newspaper A maintained its principal office in Sterling, Virginia.

4. Defendant REYNOLDS owned and was the registered agent of Company A. REYNOLDS controlled the business operations of Company A and Newspaper A, and controlled the funds invested with and loaned to Company A.

## Scheme And Artifice To Defraud

5. Beginning no later than in or about 2016, and continuing through at least in or about 2018, in the Eastern District of Virginia and elsewhere, defendant BRIAN THOMAS REYNOLDS did knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

## Purpose and Object of the Scheme

6. It was the purpose and object of the scheme for REYNOLDS to obtain funds from investors in and lenders to Company A, and to deprive lenders of funds legally due from Company A, through materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

## Manner and Means of the Scheme

7. In furtherance of the scheme to defraud, and to accomplish its unlawful objects, the following manner and means were used, among others:

8. REYNOLDS knowingly made materially false statements to investors, potential investors, lenders, and potential lenders about the existence, amount, and value of advertising contracts or other forms of agreements or commitments from companies to advertise in Newspaper A. REYNOLDS frequently and materially overstated the value of any such advertising contracts, agreements, or commitments. REYNOLDS also falsely claimed that numerous companies had entered into contracts or otherwise committed to advertise in

Newspaper A when, as he knew, no such contracts, agreements, or other forms of commitments then existed with the companies he had identified.

9. REYNOLDS created materially false and fictitious documents purporting to be contracts with various companies to advertise in Newspaper A. REYNOLDS forged these documents to make it appear falsely as though Company A had secured a source of revenue that did not in fact exist. As REYNOLDS knew, the companies reflected in these fake contracts had not agreed to the terms of the purported contracts.

10. REYNOLDS knowingly made materially false statements to investors, potential investors, lenders, and potential lenders about the historical advertising revenues earned by Company A.

11. REYNOLDS knowingly made materially false statements to investors, potential investors, lenders, and potential lenders about the amount of money that REYNOLDS and others had invested in Company A. REYNOLDS made these materially false statements by overstating the amount of money that a given investor had made, by falsely claiming that an individual had invested or committed to invest money when that individual had not done so, or by knowingly and falsely characterizing loans to Company A as investments in Company A.

12. REYNOLDS repeatedly and knowingly made the materially false statement to investors and potential investors that another individual had agreed to "match" their potential investment when that individual had not agreed to do so.

13. REYNOLDS knowingly made materially false statements to investors, potential investors, lenders, and potential lenders about the amount of debt owed by Company A. REYNOLDS did so at times by falsely claiming that Company A lacked any debt, at times by materially understating the amount of loans that Company A had received from its lenders, and

at times by knowingly and falsely characterizing loans to Company A as investments in Company A.

14. REYNOLDS knowingly made materially false statements to a lender to Company A about the terms on which that lender had agreed to lend money to Company A. REYNOLDS did so in a bid to keep the money that the lender had given Company A for a longer period of time and on repayment terms that were materially more favorable to Company A than the actual terms to which the lender had agreed. To conceal this aspect of the scheme, REYNOLDS created fraudulent loan documentation that contained terms more favorable to Company A than had actually been agreed to by the lender. REYNOLDS then attempted to pass off this falsified documentation as a true copy of the real loan agreement, when he knew that he fraudulently had altered the terms of the original agreement.

15. REYNOLDS knowingly made materially false statements to potential investors about the amount of money in Company A's bank accounts.

16. REYNOLDS knowingly made materially false statements to investors, potential investors, lenders, and potential lenders about the historical operations of Newspaper A, repeatedly claiming that Newspaper A had demonstrated its viability because it had "[t]hree full test issues circulated . . . from layout to advertising, ad sales and production." As REYNOLDS knew when he made these statements, Company A had circulated only two test issues of Newspaper A because it lacked sufficient funds to mail the third issue. REYNOLDS further knew that because the third test issue had never been circulated, several of the companies that had agreed to advertise in that issue either refused to pay for the advertising, demanded refunds, or demanded free advertising in future issues of Newspaper A as compensation.

17. REYNOLDS knowingly made materially false statements to investors, potential investors, lenders, and potential lenders regarding the identity of the people operating Company A. For example, REYNOLDS knowingly and falsely claimed that Individual CK, a prominent businessperson from Loudoun County, served on the advisory board of Company A and that he/she was a partner in the business.

## Conduct in Furtherance of the Scheme

18. In furtherance of the scheme to defraud, REYNOLDS took or caused the following actions, among others, to be taken within the Eastern District of Virginia and elsewhere:

### Fraudulent Conduct Related to Individual DB and Individual LB

19. Individual DB and Individual LB were spouses who resided in Leesburg, within the Eastern District of Virginia. REYNOLDS sought to deprive Individual DB of funds due from Company A by means of materially false and fraudulent pretenses and representations, and by concealment of material facts.

20. On or about July 12, 2016, REYNOLDS, acting on behalf of Company A, entered into a convertible loan and promissory agreement with Individual DB. Under the terms of that agreement, Individual DB lent $25,000 to Company A. Company A agreed to repay those funds over the course of one year in four equal quarterly payments plus simple interest at a rate of 8% per year. The agreement also afforded Individual DB the option to convert the outstanding unpaid principal balance of the loan into Class A ownership units in Company A, and provided that if Individual DB exercised this option before the first quarterly loan repayment was made, Individual DB would be granted 4,000 Class A ownership units, equaling a 2% ownership stake in Company A.

21. Individual DB was not provided an original of the convertible loan and promissory agreement that he/she signed on or about July 12, 2016.

22. In or around February 2017, Individual DB and Individual LB requested that REYNOLDS send them a copy of the convertible loan and promissory agreement that Individual DB had signed on or about July 12, 2016.

23. In response, REYNOLDS created a false and fraudulent document that purported to be the convertible loan and promissory agreement between Company A and Individual DB. REYNOLDS knowingly and fraudulently altered this document to include terms and conditions that were materially more favorable to Company A than the true agreement that Individual DB had signed. For example, REYNOLDS knowingly and fraudulently altered the agreement to provide that: (1) the term of the loan would be two years (rather than the actual term of one year); (2) loan payments would commence beginning on May 1, 2017 (rather than the actual agreement, which required the first loan repayment in October 2016); (3) the loan would accrue interest at the rate of 6.75% per year (rather than the actual agreed rate of 8%); and (4) if Individual DB exercised his/her option to convert the outstanding principal balance of the loan into ownership units of Company A before the first loan repayment, Individual DB would thereby receive an ownership stake worth 1.3% of Company A (rather than the true agreement to an ownership stake worth 2.0% of Company A).

24. On or about February 1, 2017, REYNOLDS emailed a copy of the fraudulently altered convertible loan and promissory agreement to Individual LB and attempted to pass off that document as reflecting the true terms and conditions that had been agreed to by Individual DB, knowing that he had materially altered the terms and conditions of the agreement.

### Fraudulent Conduct Related to Individual JG

25. Individual JG resided in Chantilly, within the Eastern District of Virginia. REYNOLDS sought to obtain funding for Company A from Individual JG by means of materially false and fraudulent pretenses and representations, and by concealment of material facts.

26. In or about Fall of 2016, Individual JG attended a meeting at the offices of Company A in Sterling, Virginia, within the Eastern District of Virginia. REYNOLDS attended this meeting and pitched Individual JG on investing in Company A.

27. On or about October 28, 2016, REYNOLDS sent an email to Individual JG in a further attempt to convince Individual JG to invest in Company A. REYNOLDS attached copies of subscription and operating agreements for Company A to this email. In the body of the email, REYNOLDS falsely claimed, "we have closed pre-sales contracts for 2017 of $723K and this should be close to $1M by the end of next week." As REYNOLDS knew, this materially overstated the value of advertising contracts that Company A had secured for 2017. In truth, as REYNOLDS knew, as of that date Company A had secured few if any contracts with companies to pay for advertising to be published in Newspaper A in 2017.

28. On or about December 13, 2016, Individual JG invested approximately $25,000 in Company A.

29. On or about January 31, 2017, in an effort to convince Individual JG to invest additional funds, REYNOLDS sent an email to Individual JG that attached what REYNOLDS described as "up to the day projections, the current investor list and projected returns" for Company A. REYNOLDS attached documents to this email that he knew to contain several materially false statements regarding Company A. Among other things:

  a. REYNOLDS attached a cash flow statement that falsely represented that Company A had earned $93,000 in revenues from the publication of three test issues of Newspaper A. In truth, as REYNOLDS knew, this materially overstated the actual revenues earned by Company A, which had failed to distribute the third test issue of Newspaper A.

  b. REYNOLDS attached a list of purported investors in Company A that he knew materially overstated the amount of money that REYNOLDS and others had invested in Company A. This list also failed to disclose that Company A had outstanding debts to several lenders.

  30. On or about January 31, 2017, REYNOLDS sent an email to Individual JG to inquire whether Individual JG would invest additional money in Company A. In this email, REYNOLDS falsely claimed that another investor, Individual NG, "has committed to another $125K!" REYNOLDS knew that this was false and that Individual NG had not committed to invest additional money in Company A.

  31. Also on January 31, 2017, REYNOLDS sent a further email to Individual JG discussing the possibility of Individual JG loaning money to Company A. In this email, REYNOLDS falsely claimed that "the company [Company A] is debt-free." REYNOLDS knew that this was false, as Company A then owed tens of thousands of dollars in debts to various lenders, including to Individual NG, Individual DB, and Individual RS.

<u>Fraudulent Conduct Related to Individual JM<br>and Individual CM</u>

  32. Individual JM and Individual CM were spouses who resided in Potomac Falls, Virginia, within the Eastern District of Virginia. REYNOLDS sought to obtain funding for Company A from Individual JM and Individual CM by means of materially false and fraudulent pretenses and representations, and by concealment of material facts.

33. On or about November 22, 2016, REYNOLDS sent an email to Individual JM and Individual CM wherein he falsely claimed, "[o]ver the past several months, we have closed $1.1M on contracts. Timing is perfect because most companies are budgeting for '17." As REYNOLDS knew, this materially overstated the value of advertising contracts that Company A had secured for 2017. In truth, as REYNOLDS knew, as of that date Company A had secured few if any contracts with companies to pay for advertising to be published in Newspaper A in 2017. REYNOLDS attached a slide presentation to this email regarding investing in Company A. As REYNOLDS knew, this presentation contained numerous materially false and misleading statements regarding Company A. Among other things:

  a. The slide presentation falsely represented, "[Newspaper A] has closed over $1M in pre-order contracts to date."

  b. The slide presentation included a copy of what purported to be an invoice issued to Company B for the sale of 24 full-page advertisements, 24 half-page advertisements, and 52 email advertisements in Newspaper A, at a total price of $57,332. As REYNOLDS knew, Company B had not agreed to purchase the amount of advertising reflected in this purported invoice.

  c. The slide presentation represented that the "Proof of Concept" for Newspaper A was "Completed" through "Three full test issues . . . . From layout to advertising, sales to production and full circulation." As REYNOLDS knew, Company A had then circulated only two test issues of Newspaper A because it lacked sufficient funds to mail the third issue. REYNOLDS further knew that because the third test issue had never been circulated, several of the companies that had agreed to advertise in that issue either refused to pay for the advertising,

demanded refunds, or demanded free advertising in future issues of Newspaper A as compensation.

## Fraudulent Conduct Related to Individual EJ

34. Individual EJ resided in Aldie, Virginia, within the Eastern District of Virginia. REYNOLDS sought to obtain funding for Company A from Individual EJ by means of materially false and fraudulent pretenses and representations, and by concealment of material facts.

35. On or about December 22, 2016, REYNOLDS sent an email to Individual EJ in an effort to induce Individual EJ to invest in Company A. REYNOLDS knowingly made several materially false statements in the body of this email and its attachments. For example:

    a. In the body of the email, REYNOLDS falsely claimed, "we want to circulate beginning in January and already have $1.2M in advanced contracts." As REYNOLDS knew, this materially overstated the value of advertising contracts that Company A had secured for 2017. In truth, as REYNOLDS knew, as of that date Company A had secured few if any contracts with companies to pay for advertising to be published in Newspaper A in 2017.

    b. REYNOLDS attached to the email a list of purported investors in Company A that materially overstated the amount of money that REYNOLDS and others had invested in Company A.

36. On or about January 5, 2017, Individual EJ invested approximately $25,000 in Company A.

37. On or about January 30, 2017, REYNOLDS sent an email to Individual EJ that attached a slide presentation regarding investing in Company A. As REYNOLDS knew, this

presentation contained numerous materially false statements regarding Company A. Among other things:

 a. The slide presentation represented falsely that during the period of "3/16 – 1/17" Company A had "[g]ained nearly $1M in advertising commitments for 2017." As REYNOLDS knew, this materially overstated the value of advertising contracts that Company A had secured for 2017. In truth, as REYNOLDS knew, as of that date Company A had secured few if any contracts with companies to pay for advertising to be published in Newspaper A in 2017.

 b. The slide presentation falsely represented that Company A had "[t]hree full test issues [of Newspaper A] produced and circulated ... from layout to advertising, ad sales and production." As REYNOLDS knew, Company A had then circulated only two test issues of Newspaper A because it lacked sufficient funds to mail the third issue. REYNOLDS further knew that because the third test issue had never been circulated, several of the companies that had agreed to advertise in that issue either refused to pay for the advertising, demanded refunds, or demanded free advertising in future issues of Newspaper A as compensation.

 c. The slide presentation included a cash flow statement that falsely represented that Company A had earned $93,000 in revenues from the publication of three test issues of Newspaper A. In truth, as REYNOLDS knew, this materially overstated the actual revenues earned by Company A, which had failed to distribute the third test issue of Newspaper A.

 d. The slide presentation attached what purported to be a "letter of financial commitment" from Individual NG to REYNOLDS as president of Company A. This supposed letter quoted Individual NG as stating, "[b]ased upon my ... thorough understanding of the

business and growth model as well as financial projections, I am committing an additional $125,000.00 in immediate funding to [Company A] for the purpose of working capital under the condition that you acquire the remaining funding needed for the Series B round." REYNOLDS had fabricated this letter. As REYNOLDS knew, moreover, Individual NG had never seen this letter or agreed to its terms, and had not committed to provide Company A with the $125,000 reflected in the purported letter.

### Fraudulent Conduct Related to Individual JJ

38. Individual JJ resided in Oakton, within the Eastern District of Virginia. REYNOLDS sought to obtain funding for Company A from Individual JJ by means of materially false and fraudulent pretenses and representations, and by concealment of material facts.

39. As noted in ¶ 37 above, on or about January 30, 2017, REYNOLDS sent an email to Individual EJ that attached a slide presentation regarding investing in Company A. As REYNOLDS knew, this presentation contained numerous materially false statements regarding Company A. On or about January 31, 2017, with the knowledge and consent of REYNOLDS, Individual EJ forwarded this slide presentation to Individual JJ.

40. In or around February 2017, Individual JJ attended a meeting at the offices of Company A in Sterling, Virginia, within the Eastern District of Virginia. REYNOLDS attended this meeting and pitched Individual JJ on investing in Company A. During the meeting, REYNOLDS began to review with Individual JJ the same slide presentation that had been emailed to Investor JJ on or about January 30, 2017, and that REYNOLDS knew to contain numerous material misrepresentations. After Individual JJ advised REYNOLDS that he/she had already reviewed the slide presentation, REYNOLDS moved on to other topics. REYNOLDS

did not, however, disclose to Investor JJ that the slide presentation contained numerous materially false statements regarding Company A.

41. On or about February 25, 2017, REYNOLDS sent an email to Individual JJ attaching a cash flow statement that falsely represented that Company A had earned $93,000 in revenues from the publication of three test issues of Newspaper A. In truth, as REYNOLDS knew, this materially overstated the actual revenues earned by Company A, which had failed to distribute the third test issue of Newspaper A.

42. On or about March 5, 2017, Individual JJ sent an email to REYNOLDS inquiring, "Can you let me know the current total cash on hand between your three accounts?" REYNOLDS replied, "We have a collective $228,594." REYNOLDS knew that this materially overstated the actual funds held by Company A, which at the time held less than approximately $25,000 in its bank accounts.

### Fraudulent Conduct Relating to Individual DC and Individual LC

43. Individual DC and Individual LC were spouses who resided in Ashburn, within the Eastern District of Virginia. REYNOLDS sought to obtain funding for Company A from Individual DC and Individual LC by means of materially false and fraudulent pretenses and representations, and by concealment of material facts.

44. In or about February 2017, REYNOLDS met with Individual DC and Individual LC at the offices of Company A in Sterling, Virginia. During that meeting, REYNOLDS falsely asserted that Company A had secured more than $1,000,000 worth of advertising contracts for 2017. As REYNOLDS knew, this materially overstated the value of advertising contracts that Company A had secured for 2017. In truth, as REYNOLDS knew, as of that date Company A had secured few if any contracts with companies to pay for advertising

to be published in Newspaper A in 2017. During the meeting, REYNOLDS also provided Individual DC and Individual LC with a slide presentation that contained numerous materially false statements regarding Company A. Among other things:

    a.    The slide presentation represented falsely that during the period of "3/16 – 1/17" Company A had "[g]ained $1M+ in advertising contracts for 2017."

    b.    The slide presentation falsely represented that had Company A had "[t]hree full test issues [of Newspaper A] produced and circulated . . . from layout to advertising, ad sales and production." As REYNOLDS knew when he made these statements, Company A had circulated only two test issues of Newspaper A because it lacked sufficient funds to mail the third issue. REYNOLDS further knew that because the third test issue had never been circulated, several of the companies that had agreed to advertise in that issue either refused to pay for the advertising, demanded refunds, or demanded free advertising in future issues of Newspaper A as compensation.

    c.    The slide presentation included a cash flow statement that falsely represented that Company A had earned $93,000 in revenues from the publication of three test issues of Newspaper A. In truth, as REYNOLDS knew, this materially overstated the actual revenues earned by Company A, which had failed to distribute the third test issue of Newspaper A.

    d.    The slide presentation attached what purported to be a "letter of financial commitment" from Individual NG to REYNOLDS as president of Company A. This supposed letter quoted Individual NG as stating, "[b]ased upon my . . . thorough understanding of the business and growth model as well as financial projections, I am committing an additional $125,000.00 in immediate funding to [Company A] for the purpose of working capital under the

condition that you acquire the remaining funding needed for the Series B round." REYNOLDS had fabricated this letter. As REYNOLDS knew, moreover, Individual NG had never seen this letter or agreed to its terms, and had not committed to provide Company A with the $125,000 reflected in the purported letter.

### Fraudulent Conduct Related to Individual CK

45. Individual CK resided in Purcellville, within the Eastern District of Virginia. REYNOLDS sought to obtain funding for Company A from Individual CK by means of materially false and fraudulent pretenses and representations, and by concealment of material facts.

46. On or about May 8, 2017, REYNOLDS sent an email to Individual CK discussing the prospect of Individual CK investing in Company A. In the email REYNOLDS falsely claimed that Individual JH would "match your funding." REYNOLDS knew that this was false, and that Individual JH had not agreed to match investments made by Individual CK.

47. On or about May 10, 2017, REYNOLDS sent another email to Individual CK in an attempt to convince Individual CK to invest in Company A. REYNOLDS attached a cash flow statement to this email that falsely represented that Company A had earned $93,000 in revenues from the publication of three test issues of Newspaper A. In truth, as REYNOLDS knew, this materially overstated the actual revenues earned by Company A, which had failed to distribute the third test issue of Newspaper A.

### Fraudulent Conduct Related to Individual RR

48. Individual RR resided in Fairfax, within the Eastern District of Virginia. REYNOLDS sought to obtain funding for Company A from Individual RR by means of

materially false and fraudulent pretenses and representations, and by concealment of material facts.

49. On or about June 10, 2017, REYNOLDS sent an email to Individual RR that attached a slide presentation regarding investing in Company A. As REYNOLDS knew, this presentation contained numerous materially false statements regarding Company A. Among other things:

a. The slide presentation represented falsely that during the period of "3/16 – 1/17" Company A had "[g]ained nearly $1M in advertising commitments for 2017." As REYNOLDS knew, this materially overstated the value of advertising contracts that Company A had secured for 2017. In truth, as REYNOLDS knew, as of that date Company A had secured few if any contracts or other forms of commitments with companies to pay for advertising to be published in Newspaper A in 2017.

b. The slide presentation purported to list a "[s]ample of [Company A] Pre-sales Advertising Multi-Insertion Contracts and Commitments." This list included 17 local companies that supposedly had entered into contracts or otherwise committed to pay for advertising in Newspaper A, along with the supposed dollar value of advertising associated with each of these companies. As REYNOLDS knew, these representations were false, and none of the listed companies had entered into advertising contracts with or otherwise committed to pay for advertising in Newspaper A in 2017.

c. The slide presentation falsely represented that had Company A had "[t]hree full test issues [of Newspaper A] circulated . . . from layout to advertising, ad sales and production." As REYNOLDS knew when he made these statements, Company A had circulated only two test issues of Newspaper A because it lacked sufficient funds to mail the third issue.

REYNOLDS further knew that because the third test issue had never been circulated, several of the companies that had agreed to advertise in that issue either refused to pay for the advertising, demanded refunds, or demanded free advertising in future issues of Newspaper A as compensation.

d. The slide presentation included a cash flow statement that falsely represented that Company A had earned $93,000 in revenues from the publication of three test issues of Newspaper A. In truth, as REYNOLDS knew, this materially overstated the actual revenues earned by Company A, which had failed to distribute the third test issue of Newspaper A.

e. The slide presentation included what purported to be a listing of the amounts of investments made by others into Company A. As REYNOLDS knew, this list falsely and materially overstated the investments made by REYNOLDS and others in Company A, falsely claimed that Individual JH had committed to invest $75,000 in Company A when in fact he had not, and falsely and materially understated the amount of debt then owed by Company A.

## Use Of Interstate Wires

50. On or about the dates listed below, for the purpose of executing the above-described scheme, in the Eastern District of Virginia and elsewhere, BRIAN THOMAS REYNOLDS, defendant herein, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, as described below:

| Count | Approx. Date | Description |
|---|---|---|
| 1 | 10/28/2016 | electronic transmission of an email from REYNOLDS addressed to Individual JG with a subject line of "[Company A] – Agreements," from a computer in the Eastern District of Virginia to a computer outside of Virginia |

17

| Count | Approx. Date | Description |
|---|---|---|
| 2 | 12/14/2016 | an electronic communication between a Branch Banking & Trust Company computer located in the Eastern District of Virginia and a computer located outside of Virginia, to credit the deposit of a $25,000 check into a Branch Banking & Trust Company account in the name of Company A |
| 3 | 1/5/2017 | an electronic communication between a Branch Banking & Trust Company computer located in the Eastern District of Virginia and a computer located outside of Virginia, to credit the deposit of a $25,000 check into a Branch Banking & Trust Company account in the name of Company A |
| 4 | 2/1/2017 | electronic transmission of an email from REYNOLDS addressed to Individual LB with a subject line of "Convert Loan Agreement – [Company A]," from a computer in the Eastern District of Virginia to a computer outside of Virginia |
| 5 | 2/22/2017 | electronic transmission of an email from REYNOLDS addressed to Individual LB with a subject line of "RE: Convert Loan Agreement – [Company A]," from a computer in the Eastern District of Virginia to a computer outside of Virginia |
| 6 | 2/25/2017 | electronic transmission of an email from REYNOLDS addressed to Individual JJ with a subject line of "[Company A] – Agreements - Projections," from a computer in the Eastern District of Virginia to a computer outside of Virginia |
| 7 | 3/5/2017 | electronic transmission of an email from REYNOLDS addressed to Individual JJ with a subject line of "RE: meetings this week," from a computer in the Eastern District of Virginia to a computer outside of Virginia |
| 8 | 5/8/2017 | electronic transmission of an email from REYNOLDS addressed to Individual CK with a subject line of "[Company A] – Confidential," from a computer in the Eastern District of Virginia to a computer outside of Virginia |
| 9 | 5/10/2017 | electronic transmission of an email from REYNOLDS addressed to Individual CK with a subject line of "[Company A] – June 29 Print Date Set," from a computer in the Eastern District of Virginia to a computer outside of Virginia |
| 10 | 6/19/2017 | an electronic communication between an Access National Bank computer located in the Eastern District of Virginia, and a computer located outside of Virginia, to credit the deposit of $167,500 in checks into an Access National Bank account in the name of Company A |
| 11 | 6/26/2017 | an electronic communication between an Access National Bank computer located in the Eastern District of Virginia, and a computer located outside of Virginia, to credit the deposit a $18,750 check into an Access National Bank account in the name of Company A |

(In violation of Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT THE PROPERTY DESCRIBED BELOW IS SUBJECT TO FORFEITURE:

51. Pursuant to Federal Rule of Criminal Procedure 32.2(a), the defendant BRIAN THOMAS REYNOLDS is hereby notified that, if convicted of an offense alleged in Counts 1 through 11 of this Indictment, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), his interest in any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as the result of the Counts of conviction.

52. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

53. The property subject to forfeiture includes, but is not limited to the following:

   a. A sum of money equal to at least $512,500 in United States currency, representing the amount of proceeds obtained as a result of the offenses.

(In accordance with Title 18, United States Code, Sections 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

G. Zachary Terwilliger
United States Attorney

By: /s/ Matthew Burke
Matthew Burke
Assistant United States Attorney
Russell L. Carlberg
Special Assistant United States Attorney

A TRUE BILL

Pursuant to the E-Government Act,, The original of this page has been filed under seal in the Clerk's Office

_____
FOREPERSON OF THE GRAND JURY